UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DEREK RAY GARCIA,

         Plaintiff,

v.

DRAGADOS-FLATIRON JOINT
VENTURE, et al.,

         Defendants.

Case No. 1:24-cv-00946 JLT EGC

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

(Docs. 19, 20)

Derek Garcia was laid off from his job as a cement mason on a project operated by the defendants, i.e., the Dragados-Flatiron Joint Venture, Dragados USA, Inc., and Flatiron West, Inc. He alleges the defendants laid him off because of his disability (a shoulder injury) and in retaliation for his accommodation requests, among other similar claims. The defendants move for summary judgment based primarily on their evidence that Garcia was laid off because the project was wrapping up. There was no work of him or anyone else. They have demonstrated that Garcia could not prove otherwise at trial. Their motion is therefore **GRANTED**.

## BACKGROUND

Garcia is entitled to the benefit of the assumption that a jury will resolve any disputes of fact in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). He is also entitled to the benefit of any reasonable inferences that can be drawn in his favor. *See id.* The

1

following summary portrays the evidence in that favorable light.

Garcia was a member of the plasterers' and cement masons' local 300. (Doc. 22-6 at 6.) He was dispatched twice to work at a job in a "precast yard," once in 2022 and once in 2023. (*See id.* at 6–7, 9, 13–14, 16, 18.) At the precast yard, large steel girders were delivered, assembled, and prepared for installation on a high speed rail construction project. (*See* Docs. 22-6 at 13; 24 at 2.) The cement masons who worked in the precast yard did a variety of finishing work, such as patching the girders to ensure they had a smooth and even surface. That is how Garcia spent most of his time. (*See* Docs. 22-6 at 7, 14–18; 24 at 2.) He worked on a team of about six other cement masons with a common supervisor (Blanca Deras) who in turn reported to the site's superintendent (Garrett Colvin). (Docs. 22-6 at 17, 22, 43; 22-7 at 8–10; 22-8 at 5, 8.) A parallel team of cement masons worked with a different supervisor. (*See* Doc. 22-8 at 13.)

This case is about an injury Garcia sustained during his second stint in the precast yard, in October 2023. He hurt his left shoulder while he was floating concrete. (Doc. 22-6 at 19–21.) He told his supervisor, and she called the superintendent. (Docs. 22-6 at 21–22; 22-8 at 8.) The superintendent took Garcia to a medical trailer, where he met with an EMT who served as the safety coordinator (Marisol Aponte). (*See* Docs. 22-6 at 22–23; 22-8 at 8; 23 at 2.) She put "Biofreeze" on his arm, told him to take ibuprofen, and sent him back to work. (Doc. 22-6 at 22–23.) In a declaration, she explains that Biofreeze can "help relive minor aches and pains in muscles and joints." (Doc. 23, at 2.) When she sent Garcia back to work, she told his supervisor that he should not use his injured arm to lift anything heavier than ten pounds and that he should be assigned to light duty. (Doc. 22-7 at 12.)

Garcia's normal patching job was considered "light duty," so the restriction did not mean he would be reassigned. (*See* Doc. 22-6 at 24.) His supervisor testified in her deposition that concrete patching involved no heavy lifting. (*See* Doc. 34-1 at 28.) She thought the only lifting was usually "less than a pound" and certainly not more than ten pounds, at least not on a regular basis. (*See id.*) Garcia remembers things differently. He testified in his deposition that concrete masons used water tanks, which they often moved around the job site with them as they worked. (*See* Doc. 31-13 at 20.) He thought these tanks probably weighed about thirty or forty pounds.

2

(*Id.* at 20–21)  He also used two buckets, one for dry cement and one for mixing, and each was heavier than ten pounds.  (*Id.* at 20–21; *see also* Doc. 31-1 at 2 (photos of this equipment).)  He had to handle all of these supplies himself.  (Doc. 31-13 at 28.)  His supervisor did have a "golf cart" that she sometimes used to help him move his supplies, but she was often too busy to help. (Doc. 31-13 at 24–25.)

Despite his supervisor's testimony, Garcia believes she knew about the heavy water tank and buckets.  She often saw Garcia carrying them, even after his injury.  (*See id.* at 25.)  Garcia remembers one day in particular.  He and the other cement masons were patching some large "tubs."  (*Id.* at 23.)  They were "big, huge things."  (*Id.*)  His supervisor told him to climb up the side of a semitruck with his supplies to reach the portion of the tub he needed to patch.  (*Id.*)  The superintendent was there, too.  (*See id.*)  This upset one of the other masons, who said to Garcia, "They know you're injured and they are making you climb the semitruck to patch the tubs."  (*Id.*)

As explained above, Garcia is entitled to the benefit of the assumption that a jury would accept his version of these events and would find him more credible than his supervisor when it comes to what his job required of him.  But to be clear, no evidence shows that Garcia was expected to lift any heavy tanks or buckets with his injured arm, nor that it was necessary for him to do this.  He did not complain to his supervisor or anyone else, either, about carrying his equipment.  (*See* Docs. 23 at 4; 31-13 at 24–25; 34-1 at 18, 31–32.)  In his own words, his right arm was "fine," so he normally used only that arm.  (Doc. 34-1 at 20.)  Sometimes he would carry everything at once, using just his uninjured right arm.  (*Id.*)  And when Garcia described the day that he and the other masons were patching the large tubs, he did not say that he was under any restriction against climbing (as opposed to heavy lifting), nor that he had requested such a restriction or thought it was necessary, and he did not say that climbing up the truck exacerbated his injury.  He did not testify either that it was necessary for him to use his injured arm to carry anything that day, nor that anyone expected him to do so, nor that he asked his supervisor or the superintendent to be excused from the task, given his injury.

In any event, as time went on, the safety coordinator checked in with Garcia about his injury, asking in text messages and over the phone if he was getting better.  He responded that he

was "okay," "a little sore" or in "a little pain," and that the pain would "come and go"; that he was using his uninjured arm to do his job; that he was taking ibuprofen and using ice at home; and that he thought this treatment was working. (Docs. 22-6 at 25–27, 35, 56; 31-3 at 2–4.) She told him to keep it up, asked if his work was aggravating his injury, and offered to help him find other work if so. (Docs. 22-6 at 27, 30–32, 59–60; 31-3 at 2–4.) He admitted in one conversation that he had used his injured arm to lift a heavy generator to move it out of the way, and he thought in retrospect that this had been a mistake. (*See* Doc. 22-6 at 31–32, 59–60.) After all, lifting or moving the generator was not actually part of his job. (*See id.*)

Although Garcia said he was okay and kept up with his work, his shoulder was not actually improving. He explained in his deposition that he had only said he was okay because he was worried that he would lose his job, although he does not explain why he came to harbor that concern. (*Id.* at 35.) He also thought for a while that "it was just a regular pain that we go through every day at work, you know, and then it goes away." (*Id.* at 37.) But eventually, after several days, Garcia told the safety coordinator that he wanted to see a doctor, and she scheduled a visit, which they attended together. (*Id.* at 36–39.)

In the appointment, Garcia was much less optimistic about his recovery than he had been before. According to the safety coordinator's notes, he told the doctor that his pain was constant, and he described it as a 9 on a scale from 1 to 10. (Doc. 31-3 at 3.) He also said that he was having trouble sleeping. (*Id.* at 4.) The doctor ordered physical therapy and chiropractic treatment, prescribed a muscle relaxant, and gave him the same lifting and light work restrictions that the safety coordinator had already imposed. (Docs. 31-3 at 4; 22-6 at 39.) The change in Garcia's description of his pain was so marked that it prompted the safety coordinator to email the superintendent and others to emphasize his inconsistency. (*See* Doc. 31-3 at 2–4.) She also told them about his concern, which he had previously expressed to her, that he might be "laid off" now that he was "jacked up." (*Id.* at 2.)

As it turned out, the defendants had anticipated for several months that the precast yard would close down at the end of 2023. (*See* Doc. 31-5 at 3–4.) And in October 2023—the same month Garcia injured his shoulder—the superintendent learned that it would be necessary to lay

4

off several workers "due to a significant reduction in available work." (*Id.*)  He contacted Garcia's supervisor to ask who should be laid off.  (*See* Doc. 22-7 at 15–20.)  Garcia was the newest man in the crew and had the least seniority, so his supervisor gave his name to the superintendent.  (*See id.*; *see also* Doc. 22-8 at 12.)  The superintendent asked around to see if any other supervisors could add Garcia to their teams, but no one had work to give him.  (Doc. 24 at 3.)  He broke the bad news to Garcia in person on November 7, 2023.  (*See* Doc. 22-6 at 44–45.)  "Well, Derek," he said, "it's that time of year."  (*Id.* at 44.)  He gave Garcia his last check and the notice of his termination.  (*Id.*)  "That was it."  (*Id.*)  According to the notice, Garcia was laid off as part of a reduction in force.  (*See* Doc. 22-6 at 43, 69.)  He was eligible to be rehired if the need arose.  (*See id.*)

A cement mason on the parallel crew was also laid off a week or two later, and people in other jobs (carpenters, ironworkers, and general laborers) were laid off at about this time.  (Doc. 22-8 at 13–14.)  The precast yard shut down as anticipated in December 2023 or January 2024.  (*Id.* at 12.)  It has not been reopened.  (*Id.* at 19.)  Everyone who worked there was either laid off or reassigned.  (*See id.*)  The superintendent could not remember in his deposition how many workers were laid off and how many were reassigned.  (Docs. 22-7 at 19; 22-8 at 14, 19.)

Garcia filed this lawsuit a few months after he was laid off.  (*See* Doc. 5-1.)  He asserts four claims for violations of the California Fair Employment and Housing Act: disability discrimination, retaliation, a failure to engage in good faith in the interactive process to find a reasonable accommodation, and a failure to provide a reasonable accommodation.  (*Id.* at 8–14.)  In broad strokes, he alleges that he was fired because of a disability and in retaliation for his request for an no-heavy-lifting accommodation, and he alleges that the defendants did not attempt to find (and did not offer him) accommodations that would have made it possible for him to stay on.  He also asserts a common-law claim for unlawful termination in violation of public policy.  (*Id.* at 14–15.)  He seeks compensatory and punitive damages, an injunction, and other relief.  (*Id.* at 15–16.)

The defendants move for summary judgment, and that motion is now fully briefed.  (Docs. 19–20, 26, 32.)  The Court did not hear oral arguments.  (Doc. 37.)

**LEGAL STANDARDS**

A district court can grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  As noted, the Court takes the evidence in the light most favorable to the party who opposes the motion and draws justifiable inferences in that party's favor. *See id.* at 255.

Although Garcia and the defendants agree about the basics of this familiar procedure, they disagree about some of its particulars, and they both rely at times on California's procedural rules rather than the Federal Rules of Civil Procedure, which this Court must follow. (*See, e.g.*, Docs. 19 at 11–12; 26 at 12–13.)  In these circumstances, it is worth reviewing the controlling federal procedure in a bit more detail.

The first important fact to keep in mind at the summary judgment stage is actually who would have the "ultimately burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the party moving for summary judgment would have that burden on a particular issue, then the moving party's burden at the summary judgment stage is to persuade the district court that "no reasonable jury" could find in favor of the opposing party. *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 (9th Cir. 1997).  It is not enough for that party to prove merely that it could establish the essential elements of its claims or defenses at trial; it must prove those essential elements "beyond controversy." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (per curiam) (quotations marks and citation omitted).

By contrast, when the party moving for summary judgment would not have the ultimate burden of persuasion at trial, then that party's burden at the summary judgment stage has two parts: "the initial burden of production and the ultimate burden of persuasion." *Nissan Fire*, 210 F.3d at 1102.  To carry its "initial burden of production," the moving party must either:

(1) produce evidence negating an essential element of the opposing party's claim or defense; or (2) show that there is an absence of evidence to support the opposing party's case. *Id.* To carry the burden of "persuasion," the moving party must show the district court that "there is no genuine issue of material fact." *Id.*

If the moving party does not carry its initial burden, then the opposing party has no obligation to produce anything. *Id.* at 1102–03. The motion must be denied. *See id.* That is true even if the opposing party would have the ultimate burden of persuasion at trial. *Id.* If, however, the moving party does carry its initial burden of production, then it falls to the opposing party to produce evidence showing that there is a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation marks omitted). It must offer "evidence on which the jury could reasonably find" in its favor. *Anderson*, 477 U.S. at 252. Conclusory and speculative testimony is not enough. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Nor can the opposing party rely on evidence that it could not present in a form that would be admissible at trial. *See* Fed. R. Civ. P. 56(c). A "desire to cross-examine an affiant" at trial also falls short. *Noguera v. Davis*, 5 F.4th 1020, 1056 (9th Cir. 2021). If the opposing party does not produce enough evidence to create a genuine issue of material fact, the Court must grant the motion. *Celotex*, 477 U.S. at 322.

Litigants often dismiss their opposing party's declarations as "self-serving" and "uncorroborated," as the defendants do in this case. (*See, e.g.*, Doc. 32 at 1, 3.) Arguments like these might be persuasive to a jury in a trial. They are not persuasive in a brief supporting a summary judgment motion. It is reversible error for a district court to disregard a declaration at the summary judgment stage simply because that declaration serves the purposes of the party who filed it, even if it lacks corroborating evidence. *See, e.g.*, *Nigro v. Sears, Roebuck & Co.*, 784

7

F.3d 495, 498 (9th Cir. 2015).  There would be little use for a declaration that does not support a party's position, and disputes about corroboration and the declarant's credibility must await the trial.  *See S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).

This is not to say, however, that a person can avoid summary judgment by filing a declaration full of generic assertions and claims beyond his personal knowledge.  *See, e.g.*, *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  As explained above, a party cannot avoid summary judgment with evidence that could not be presented in a form that would be admissible at trial.  *See* Fed. R. Civ. P. 56(c).  And under the federal rules, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.

These federal procedural rules can sometimes be difficult to apply when they are layered on top of the substantive state law rules that would come into play at trial, which might also be expressed in terms of shifting burdens.  That is true in many cases of employment discrimination.  California courts have adopted the three-part "*McDonnell Douglas* burden-shifting framework" to try cases in which a plaintiff alleges an employer treated him differently because of a protected characteristic, such as a disability.  *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145 (9th Cir. 2017) (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000), *in turn citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  At trial, it is first for the plaintiff to make out a "prima facie case" of discrimination by showing he had a "disability" (or was regarded as having such a disability), could perform his essential job duties (with a reasonable accommodation if necessary), and was subject to some "adverse employment action" because of the disability (or perceived disability).  *E.g.*, *Price v. Victor Valley Union High Sch. Dist.*, 85 Cal. App. 5th 231, 239 (2022).  If the employee makes this prima facie case, then the burden shifts to the employer, whose obligation it is to come forward with evidence that its decision was legitimate, not discriminatory.  *See id.* at 244.  If it offers that evidence, then the burden shifts back to the employee, who can prevail by persuading the factfinder that the employer's reason is a pretext or is not to be believed.  *See id.*

An employer in a disability discrimination case could rely on arguments tied to each step

8

of this three-part process in a motion for summary judgment. It could argue, for example, that the "adverse employment action" had nothing to do with an actual or perceived disability. It would be employee's burden to make out a prima facie case at trial. *See id.* at 239. For that reason, the employer would win at summary judgment if the employee could not cite evidence creating a genuine dispute about whether the adverse action was "because of" a disability. *See Nissan Fire & Marine*, 210 F.3d at 1102–03; *Merrick*, 867 F.3d at 1146.

The employer could also argue in its summary judgment motion that it had a legitimate, non-discriminatory reason for its actions. The employer would have the burden to come forward with that evidence at trial. *See Price*, 85 Cal. App. 5th at 244. This means the employer would have to support its summary judgment motion with both the legitimate, nondiscriminatory reasons and the supporting record—the evidence it would present to the jury at trial. *See Merrick*, 867 F.3d at 1146–47.

Finally, the employer could argue in its motion that there is no evidence that could refute its legitimate, nondiscriminatory reason. If so, the employee would have the burden to prove at trial that the employer's explanation is a pretext or not believable. *See Price*, 85 Cal. App. 5th at 244. So at summary judgment, it would be the employee's burden to respond with citations to evidence that a factfinder could reasonably rely on to reject the employer's explanation at trial. *See Nissan Fire & Marine*, 210 F.3d at 1102–03; *Merrick*, 867 F.3d at 1147–50. If the employee could not cite that evidence, then the employer's motion would be granted. *See Merrick*, 867 F.3d at 1150. There would be no reason for a trial, because no evidence could show that the employer had a discriminatory motive. *See id.*

**DISCUSSION**

**I.    Discrimination, Retaliation, and Wrongful Termination**

Garcia's first claim is based on his allegations of disability discrimination in violation of the Fair Employment and Housing Act. The defendants argue he could not make out a prima facie case of discrimination at trial, and they argue that he could not refute their evidence that he was laid off because the precast yard was winding down, not because of his injury.

At trial, Garcia's prima facie case would be the first step. A good portion of the relevant

9

evidence is not in dispute.  The defendants are willing concede for present purposes that Garcia had a "disability" under the terms of the Fair Employment and Housing Act.  They express no doubts about his ability to do his job.  There is no question that getting laid off is an "adverse employment action."  The only dispute is whether any evidence could connect Garcia's termination to his injury.

It would suffice for Garcia to prove at trial that his injury was merely "a substantial motivating factor" in the defendants' decision.  *Price*, 85 Cal. App. 5th at 243.  This is not an "onerous" burden.  *Zamora v. Sec. Indus. Specialists, Inc.*, 71 Cal. App. 5th 1, 37 (2021).  State appellate courts have said that "very little evidence is required" of a plaintiff in this step of the three-step process.  *Id.*  Despite the defendants' arguments to the contrary, the record includes evidence that Garcia could use at trial to show that there was a connection between his injury and his termination.  He was laid off soon after he was injured, unlike others without injuries, who were reassigned.  This evidence would permit a reasonable jury to decide that Garcia was laid off because of his injury, at least in part.  That is all that he must do to avoid summary judgment with respect to his prima facie case.  *See, e.g.*, *Merrick*, 867 F.3d at 1146.

At the second step of the three-step test, the defendants have come forward with evidence to support their argument that Garcia was laid off as part of a reduction in force, i.e., for a legitimate, nondiscriminatory reason.  The undisputed record shows that the defendants anticipated closing the precast yard for several months before Garcia was fired, that Garcia's supervisor put his name forward because he had the least seniority of those in his crew, that the superintendent tried to find alternative work for him, that his notice of termination expressly cited a reduction in force, and that the precast yard closed after Garcia was laid off.  The defendants have also argued without contradiction that no one made derogatory comments about Garcia's injury and that no one attributed his termination to his injury.  This evidence therefore shows beyond dispute that the burden of proof would shift back to Garcia at trial at the third step of the *McDonnell Douglas* test.

Because Garcia would bear the ultimate burden of proof at trial at the third step, he can avoid summary judgment only by citing evidence that would permit a reasonable jury either to

reject the defendants' explanation as false or to believe that "the true reason for his termination was discriminatory." *Id.*; *see also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 & n.2 (9th Cir. 1996). He can rely on the same evidence that he would cite in making his prima facie case, but he must "do more than establish a prima facie case and deny the credibility of [the defendants'] witnesses." *Merrick*, 867 F.3d at 1146 (other alterations omitted) (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000)). He cannot rely on timing alone. The "temporal proximity" of his injury to his termination "is not sufficient to raise a triable issue as to pretext" now that the defendants have offered "a legitimate, nondiscriminatory reason for the termination." *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 353 (2008).

Garcia relies on two categories of arguments that, in his view, could persuade a jury to reject the defendants' explanation. First, he argues that a jury could doubt that his termination was a consequence of the precast yard's imminent closure. (Doc. 26 at 18–20.) He argues that the precast yard did not actually close down until several weeks after he was laid off and that work was ongoing. (*See id.*) The relevant evidence is undisputed, and it does not support Garcia's argument. According to the defendants' written responses to Garcia's discovery requests, they had been planning for several months to close the precast yard by the end of the year, and they discussed reductions in work in mid-October 2023 (Doc. 31-5 at 3–4). The superintendent, who was involved in these discussions, asked Garcia's supervisor who should be laid off, and she picked Garcia. (*Id.* at 16.) As she recalled, she learned from the superintendent a "couple of weeks" before Garcia's termination that a "layoff was coming" because work "were getting slow." (Doc. 22-7 at 15, 17.) Because he was one of the most recent hires, he was one of the first people to be laid off. (See Doc. 22-8 at 12.) Others were laid off or reassigned in the weeks that followed, as the yard closed down for all work except outgoing shipments of the completed girders. (*See* Doc. 22-8 at 12, 14, 18–19.)

Second, Garcia argues that the defendants' explanation lacks "any sort of legitimate criteria, written records, or basis in hard fact." (Doc. 26 at 20.) He argues that his supervisor's and the superintendent's explanations are not credible because they have not cited any written records, formal policies, or other corroborating evidence beyond their deposition testimony. (*See*

11

*id.* at 20–21.)  He faults them for not remembering exactly who else was laid off, who was transferred, and how long each concrete mason had been working at the precast site.  (*See id.*)  He cannot rely on these types of credibility arguments to create a factual dispute at the third step of the test.  *See Merrick*, 867 F.3d at 1146.  And more generally, "[a] party asserting that a fact . . . is genuinely disputed must support that assertion by . . . citing to particular parts of the materials in the record," not by arguing about missing evidence.  Fed. R. Civ. P. 56(c)(1)(A).  For that reason, a general desire to cross examine a witness does not suffice to defeat a summary judgment motion.  *See Noguera*, 5 F.4th at 1056.  Nor do Garcia's claims about topics beyond his "personal knowledge" support his position.  *See* Fed. R. Civ. P. 56(c)(4).  Garcia cites no case, rule, or law that bars summary judgment when the moving defendant does not corroborate its witnesses' undisputed testimony, and the Court is aware of none.  The available authority suggest otherwise.  *See, e.g.*, *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 356 (2000) ("The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff.").

In some portions of Garcia's opposition brief, he also suggests that his supervisor's failure to police his lifting could show that he was fired because of his injury.  (*See, e.g.*, Doc. 26 at 19.)  As the defendants argue in reply, California courts do not generally treat evidence of a failure to accommodate or of a failure to engage in the interactive process as evidence of employment discrimination.  *See, e.g.*, *Brown v. L.A. Unified Sch. Dist.*, 60 Cal. App. 5th 1092, 1107 (2021).  A failure to accommodate or a failure to engage is not an adverse employment action.  *Id.*  But if there was an adverse employment action—such as a termination, as in Garcia's case—then it is possible that an employer's refusals to engage or accommodate might reveal a discriminatory state of mind.  *See id.* (considering the possibility that an employer's actions could reveal "bias" against a plaintiff).  It is not necessary to dwell on this possibility.  No evidence shows that Garcia's supervisor expected or instructed him to lift heavy supplies with his injured arm.  He testified that he could and did move his water tank and cement buckets with his healthy arm.  It might have been more time-consuming to work this way, but no evidence shows he was fired because he was working too slowly or because he was using just his uninjured arm.

In sum, the defendants have demonstrated that Garcia cannot refute their proof that he was

laid off as a part of a reduction in force, i.e., for reasons other than his alleged disability. They are therefore entitled to summary judgment on Garcia's claim for disability discrimination.

"California courts also employ the *McDonnell Douglas* burden-shifting framework in analyzing retaliation claims." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1243 (9th Cir. 2013) (citing *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005)); *see also Wilkin v. Cmty. Hosp. of Monterey Peninsula*, 71 Cal. App. 5th 806, 828 (2021). The reasoning in this subsection thus applies equally to Garcia's claim of unlawful retaliation. The defendants are entitled to summary judgment of that claim as well.

Finally, because "[a] common law claim for wrongful termination in violation of public policy requires a showing that there has been a violation of a fundamental public policy embodied in statute," the defendants are also entitled to summary judgment of Garcia's wrongful termination claim. *Merrick*, 867 F.3d at 1150.

## II.      Failure to Accommodate and Interactive Process

Garcia's remaining claims relate to the accommodation he received and the interactive process. *See* Cal. Gov't Code § 12940(m) (making it unlawful for an employer "to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee"); *id.* § 12940(n) (making it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical . . . disability or known medical condition").

These claims have a common fault: the defendants granted Garcia the heavy-lifting restriction that he now proposes as a reasonable accommodation. The safety coordinator also repeatedly checked in on Garcia and urged him not to use his injured arm to do any heavy lifting. She also made sure that his supervisor knew about his restriction, and she arranged for him to see a doctor when his condition declined. Garcia has not cited evidence to show he requested a different restriction or made complaints. He has not cited evidence to show his supervisor or anyone else required him to lift heavy supplies with his injured arm. As summarized above, he testified that he could use his healthy arm.

At the risk of stating the obvious, a plaintiff cannot prevail in a claim for failure to accommodate or for failure to engage if the employer granted a reasonable accommodation after engaging. *See, e.g.*, *Watkins v. Ameripride Servs.*, 375 F.3d 821, 828 (9th Cir. 2004); *Coleman v. Midlands Carrier Transicold*, No. 14-01472, 2015 WL 5159440, at *15 (E.D. Cal. Sept. 2, 2015). True enough, a jury could potentially decide that Garcia's supervisor saw him lifting heavy things with his injured arm and did not stop him. But again, he has not cited evidence to show that he brought any concerns about heavy lifting to anyone's attention, let alone that anyone rejected or dismissed such a concern. It is undisputed, in fact, that he once decided on his own to lift a heavy generator, even though this was not a part of his job, and even though the safety coordinator had told him not to lift anything heavy with his injured arm.

Garcia seems to contend at some points that the defendants should have granted him a more restrictive accommodation, i.e., no lifting more than ten pounds at all, no matter whether he used one arm or the other. (*See, e.g.*, Doc. 26 at 21.) The evidence does not show this accommodation was reasonable. He did not injure both arms. His other arm was "fine," in his own words, and he has not explained why a more restrictive accommodation was necessary.

Garcia also argues unpersuasively that the defendants did not accommodate him and did not engage with him because the safety coordinator provided medical treatments that, in his view, were "subpar"; because she was not a "licensed physician"; and because she did not arrange for him see a doctor as quickly as he would have liked. (*See id.* at 21–22.) Citations to supporting cases and statutes are conspicuously absent from the portions of the opposition brief in which he advances these arguments. The Court's own searches have returned no authority to support his position. Instead, as the defendants argue in their reply, California courts have held that the Fair Employment and Housing Act "does not obligate an employer to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks." *Thomsen v. Georgia-Pac. Corrugated, LLC*, 190 F. Supp. 3d 959, 966 (E.D. Cal. 2016) (quoting *Raine v. City of Burbank*, 135 Cal. App. 4th 1215, 1222 (2006)).

## CONCLUSION

The motion for summary judgment (Docs 19, 20) is **GRANTED**. The Clerk's Office is

14

directed to enter judgment for the defendants and close the case.

IT IS SO ORDERED.

Dated:    **June 28, 2026**

UNITED STATES DISTRICT JUDGE